SABER LAW GROUP
MATTHEW NOEL, Cal. Bar. No. 242172
mnoel@saberlaw.com
101 Howard Street, Suite 400
San Francisco, CA 94105
Telephone:   (415) 278-1400
Facsimile:   (415) 278-1401

Attorneys for Plaintiff
WESTERN BULK PTE LTD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WESTERN BULK PTE LTD<br><br>          Plaintiff,<br><br>     v.<br><br>CHS INC.<br><br>          Defendant. | Case No.: 22-CV- 3326<br><br>*Honorable*<br><br>**ADMIRALTY RULE 9(h)**<br>**VERIFIED COMPLAINT** |

**VERIFIED COMPLAINT**

Plaintiff Western Bulk Pte Ltd ("WESTERN BULK" or "Owner") files this Verified Complaint against Defendant CHS Inc. ("CHS" or "Charterer") and alleges on knowledge as to its own acts and upon information and belief as to CHS and third parties as follows:

**SUBJECT MATTER JURISDICTION**

1. This is an admiralty or maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 U.S.C. § 1333.

**PARTIES**

2. WESTERN BULK is a foreign business entity organized and existing under the laws of Singapore with a principal place of business at 16 Collyer Quay #28-01, Singapore 049318. At all relevant times referred to herein, Western Bulk was the disponent owner of the vessel MV SOPHIA K (the "**Vessel**").

3. Upon information and belief, CHS is a business entity organized under the laws of the State of Minnesota, with a principal place of business at 5500 Cenex Drive, Inver Grove Heights, Minnesota 55077. At all relevant times referred to herein, CHS was the voyage charterer of the Vessel.

**FACTS**

**The Charterparty**

4. Under the terms of a charterparty on an amended CHSVOY form dated July 5, 2021 (the "**Charterparty**"), WESTERN BULK agreed to let and CHS agreed to hire the M/V "KP ALBATROSS" or a substitute vessel for a voyage from Mesaieed, Qatar, to Santos, Brazil, with a cargo of approximately 45,000 mt of bulk urea fertilizer. Attached hereto and made a part hereof as Exhibit 1 is a true and correct copy of the confirmation email (pages 1-3) together with the CHSVOY form (pages 4-40).

5. Under the terms of a charterparty on an amended NYPE 1946 form dated July 16, 2021 (the "**Head Charter**"), Parisian Maritime Limited agreed to let and WESTERN BULK agreed to hire the Vessel for a one time charter trip via Qatar to Brazil of approximately 50 days without guarantee.

6. The Vessel was nominated to CHS as a substitute for the KP ALBATROSS to perform the Charterparty on July 14, 2021. CHS accepted the substituted nomination on July 16, 2021. Attached hereto and made a part hereof as <u>Exhibit 2</u> is a true and correct copy of the nomination and acceptance emails (pages 41-43).

7. The Charterparty provided, *inter alia,* as follows:

"14. Demurrage / Despatch

USD39,000 / USD19,500

...

7. <u>Loading and discharging terms</u>

...

Discharge Rate:

*1 safe berth Santos Termag 6,000 metric tons per weather working day shinc*

*All load and discharge rates noted in this recap are basis weather working days (wwd).*

*Cargo to be loaded by Charterers at the average rate stated in Box 13 and discharged by Charterers at the average rate stated in Box 15, per weather working day of 24 consecutive hours (and for the avoidance of doubt and without limitation, bad weather includes fog and smog) ... Sundays and Holidays included at discharge port.*

*Time shall not count, even if the Vessel is on demurrage, for (a) opening and closing of hatches at commencement and completion of loading or discharging at each load or discharge port; (b) periods of ballasting or de-ballasting at the load or discharge port(s) unless loading or discharging is continuing at the shore's load or discharge rate simultaneously with ballasting or de-ballasting; (c) time spent waiting to attain under-keel clearance; (d) any time period that the Vessel could move, shift or navigate but for a prohibition against such movement, shifting or navigation at the discharge port(s) or (e) any time period that the Vessel could complete any operations listed at (a)-(d) of this clause or any time period that the Vessel could move, shift or navigate but for a Vessel Cyber Attack (as defined below). Upon completion of loading or discharging, Owners and/or the Master shall agree to sign, on request of Charterers, a statement of facts which Charterers will arrange to be countersigned by or on behalf of the shipper /receiver (as relevant).*

...

8. <u>Demurrage</u>

*Charterers shall pay Owners demurrage [at the rate specified in Box 14] for laytime exceeded in loading and/or discharging ...*

///

*Owners shall provide Charterers with their calculations of demurrage or despatch, time sheets, Statements of Facts and signed Notices of Readiness within [15 (fifteen)] days after departure from the final load port or discharge port (as relevant). All demurrage/ despatch, if any, to be settled within 30 (thirty) days after completion of discharging ...*

12. <u>Commencement of Laytime at Discharge Port(s)</u>

*Laytime to commence 12 hours after NOR has been tendered unless sooner commenced, in which case half actual time used to count. In any case, time not to count during special holidays as listed in Clause 36 here below.*

*Time used by the Vessel in proceeding from one discharging berth or place to another discharging berth or place and making ready for discharging (including time when the discharging berth or anchorage is not working or operating or accessible due to weather, time spent waiting for daylight, up heaving anchor, mooring, fastening, clearing inward formalities, obtaining customs clearance and pratique) shall not count as laytime or time on demurrage unless such delay is directly caused by an act of Charterers.*

*Laytime shall cease to count upon completion of cargo discharging.*

*Time lost by inability of the vessel to load and discharge in accordance with this charter shall not count as used laytime or time on demurrage.*

*...*

14. <u>Stevedoring</u>

*Stevedores both at load and discharge port(s) to be appointed by Shippers and/or Charterers and/or Receivers.*

*Cargo to be loaded, spout trimmed and discharged free of expense to the Vessel ...*

*...*

22. <u>Vessel Deficiencies</u>

*Any delay incurred after tender of NOR arising from:*

a) *a deficiency affecting the Vessel's ability to ballast and de-ballast or any of the Vessel's equipment or machinery required for loading and discharging operations;*

b) *an act or omission of Owners or the Vessel; or*

c) *a deficiency in or breakdown of the Vessel, her equipment, machinery, maintenance, stores, crew, certificates*

*shall not count as laytime or time on demurrage ..."*

**Facts giving rise to the Maritime Claim**

    8.    The Vessel loaded 49,499.998 MT of granular urea in bulk (the **"Cargo"**) at Mesaieed, Qatar between July 27, 2021 and August 4, 2021.

Discharge

9. The Vessel arrived at Santos on September 7, 2021 and tendered NOR at 0137 hrs LT.

10. Discharge commenced at 0010 hrs on October 1, 2021.

11. The Cargo was in a caked/compacted condition and, as a result, was not free-flowing inside the holds and obstructed the hopper used for discharge operations. A bulldozer had to be placed inside the holds to loosen the Cargo.

12. Discharge was interrupted on a number of occasions, with the Vessel being ordered by the port authorities to shift from the berth to give priority to other vessels.

13. Discharge was completed at 1555 hrs LT on January 14, 2022.

14. CHS took 125 days, 6 hours and 45 minutes to discharge the Cargo, while the agreed laytime at Santos, Brazil was 8 days and 6 hours. The Vessel was therefore on demurrage for 117 days and 45 minutes at a rate of USD 39,000 per day.

**Breach of the Charterparty**

15. On January 17, 2022 (i.e., 3 days following the completion of discharge), WESTERN BULK wrote to CHS attaching its discharge port laytime calculation, together with the discharge port Notice of Readiness and Statements of Facts which showed that demurrage in the amount of $4,564,218.75 was due to WESTERN BULK (the "**Claim**").

16. On January 31, 2022, CHS acknowledged receipt of the Claim but stated that it intended to defend the Claim on the basis that the delays at Santos, Brazil arose out of damage to the Cargo for which WESTERN BULK was responsible.

17. WESTERN BULK responded to CHS on February 3, 2022, pointing out that CHS had failed to identify the legal basis upon which it was disputing the Claim and stating that even if the Cargo was damaged (which was in any event denied), this did not fall within one of the exceptions to demurrage under the Charterparty. CHS failed to respond to this message, and accordingly on February 15, 2022, WESTERN BULK's Defence Club sent a demand for payment to CHS. Attached hereto and made a part hereof as Exhibit 3 is a true and correct copy of the email exchange detailed in the within paragraph and two immediately preceding paragraphs.

18.     On March 24, 2022, CHS paid $863,113.53 to WESTERN BULK in part payment of the Claim. This represented the freight and undisputed demurrage for the period (19.5 days) from when demurrage commenced (at 0840 hrs LT on September 19, 2021) until shifting on September 30, 2021, plus the time allowed for discharge operations.

19.     CHS is liable to WESTERN BULK for demurrage in respect of its failure to discharge within the agreed laytime because (a) CHS does not fall within an express exception to demurrage under the terms of the Charterparty and (b) the caking/compaction of the Cargo, which caused delay at Santos, Brazil, was not due to the fault of WESTERN BULK or those for whom WESTERN BULK was responsible.

**Loss and Damage**

20.     CHS has failed to pay demurrage that has been due and owing to WESTERN BULK since February 14, 2022. WESTERN BULK has accordingly suffered loss and damage in the amount of $3,701,105.22, together with interest and costs (which costs include attorney's fees).

21.     Plaintiff thereby sustained damages in the total principal amount of $3,701,105.22, plus interest, costs and incurred and estimated attorney's fees.

**Pending Arbitration & Attorneys' Fees**

22.     The Charterparty provides that all disputes between the parties shall be submitted to arbitration in London, with English Law to apply thereto under the Arbitration Acts of 1950 and 1979.

23.     Under English Law, pursuant to Section 61(2) of the Arbitration Act of 1996, costs follow the event; such costs to include the costs of arbitration and litigation, including attorneys' fees, costs, and expenses.

24.     In accordance with the foregoing, Owner has commenced arbitration in London against Charterer, which is currently pending.

25.     Owner has requested security from Charterer with respect to its damages, which Charterer has refused to provide.

///

26. Owner reserves all rights to seek increased security as may be needed in this proceeding. Likewise, Owner reserves all rights to seek and recover the full quantum of its damages, attorneys' fees, costs, interest and other expenses in arbitration in England.

## BREACH OF MARITIME CONTRACT UNDER U.S. LAW

27. Charterer breached its obligations to perform under the Charterparty in the various ways set forth above, and breached the Charterparty by failing to make payments of the amounts that accrued as a result, as set forth above, despite due demand.

28. The Charterparty is a quintessential maritime contract, as it is a voyage charterparty for vessel services.

29. By failing to pay the amounts owed to Owner, Charterer has thereby breached a maritime contract, giving rise to a quintessential maritime or admiralty claim.

## SUPPLEMENTAL RULE B ALLEGATIONS

30. As set forth above, pursuant to the Charterparty, the underlying merits of the dispute are being resolved by arbitration in London. Owner expressly reserves all its rights to continue to arbitrate the merits of the underlying dispute.

31. Owner brings this action solely to obtain *quasi in rem* jurisdiction over Charterer, to secure the claims being pursued in the London arbitration more fully described above.

**CHS cannot be found in this District**

32. After a diligent search, as is set forth in the accompanying Declaration of Joseph T. Johnson, Esq., WESTERN BULK respectfully submits that CHS cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

33. Diligent searches of the website maintained by the California Secretary of State, of the internet Whitepages directory, and a general internet search via Google did not identify CHS as:

   a) Ever being registered or authorized to transact business in the State of California;

   a) Being incorporated or registered in the State of California;

   b) Having appointed an agent for service of process in this District; or

c) Having any other presence in this District.

34. Further, WESTERN BULK is unaware of CHS having any general or managing agents in this District.

35. Accordingly, CHS cannot be "found" within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, and WESTERN BULK seeks an Order of Attachment against such property, tangible or intangible, of CHS as may be found within the District, up to and including the full amount claimed herein (and subject to WESTERN BULK's reservation of all rights to adjust that amount as may become necessary and proper).

36. WESTERN BULK is accordingly entitled to attach CHS's property within this District pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

**The property of CHS is or will be in this District**

37. Upon information and belief, CHS has or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees within the District which are believed to be or will be due and owing to CHS. (*Id.*).

38. Upon information and belief, the specific, known Garnishee holding assets due and owing to CHS or to be holding such assets is Wells Fargo Bank, N.A., located at 420 Montgomery Street, San Francisco, California 94104 (although Owner reserves the right to amend and supplement with respect to additional Garnishees).

39. CHS has previously made payments to WESTERN BULK, as recently as March 2022, which were, upon information and belief, initiated through Wells Fargo Bank as CHS's issuing bank. The information upon which WESTERN BULK has formed this reasonable belief is documentation CHS provided to WESTERN BULK in connection with such payments indicating the foregoing.

40. WESTERN BULK seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching, *inter alia*, any assets of CHS held by garnishees within the District, specifically the

Garnishee identified above, for the purpose of obtaining personal jurisdiction over CHS and to secure WESTERN BULK's claims, as described above.

## AS AND FOR A FIRST CAUSE OF ACTION:
## ATTACHMENT OF INTANGIBLE PROPERTY OF CHS INC.

41. CHS breached its maritime contractual obligations to WESTERN BULK.

42. CHS's breach caused WESTERN BULK to suffer damages of not less than $3,701,105.22, plus interest, costs and attorney's fees (which are recoverable under English law).

43. WESTERN BULK expressly reserves all of its rights to have the underlying merits of its claims resolved by the pending arbitration in London.

44. WESTERN BULK brings this action to obtain *quasi in rem* jurisdiction over CHS, and security for the enforcement of any resulting awards and/or judgments which it may obtain against CHS.

45. CHS cannot be found within this District, but its property (namely monies held at Wells Fargo Bank N.A.) are, may be, or soon will be, found within this District.

46. WESTERN BULK is accordingly entitled to attach CHS's property (namely monies in said account) within this District.

47. WESTERN BULK seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching any and all assets of CHS up to the amount of $3,701,105.22, plus interest, costs and attorney's fees, for the purpose of obtaining personal jurisdiction over CHS and to secure Western Bulk's claims, as described above.

WHEREFORE, Plaintiff prays for the following:

(A) That process in due form of law issue against Defendant citing it to appear and answer under oath all and singular the matters alleged in this Verified Complaint, failing which default judgment be entered against it in the sum of $3,701,105.22, plus interest, costs and attorneys' fees;

(B) That since Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of

Civil Procedure, the Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all property, tangible or intangible, in whatever form, in the amount of $3,701,105.22, plus interest, costs and attorney's fees, belonging to, due or being transferred to, from or for the benefit of Defendant, moving through, or within the possession, custody or control of garnishees to be named, and specifically the Garnishee identified hereinto, to establish personal jurisdiction over Defendant and to secure Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Rules B and E, answer the matters alleged in this Verified Complaint.

(C) That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

(D) That this Court recognize and confirm any award or judgment(s) rendered on the claims against Defendant set forth herein as a judgment of this Court;

(E) That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

(F) For such other and further relief as the Court deems just and proper.

Dated:  June 7, 2022

                                  SABER LAW GROUP

                                  By: /s/ Matthew Noel
                                  MATTHEW NOEL

                                *Attorneys for Plaintiff*
                                WESTERN BULK PTE LTD

Joseph T. Johnson
Luke F. Zadkovich
**Zeiler Floyd Zadkovich (US) LLP**
215 Park Ave. South, 11th Floor
New York, New York 10003
joe.johnson@zeilerfloydzad.com
luke.zadkovich@zeilerfloydzad.com
917-375-9511
917-868-1245

*Attorneys for Plaintiff*
*(to be admitted pro hac vice)*

CASE NO.: 22-CV-                                                                              VERIFIED COMPLAINT

# VERIFICATION

Pursuant to 28 U.S.C. § 1746, Alan Curran declares as follows:

I am the General Counsel of Plaintiff, Western Bulk Pte Ltd, and an authorized officer thereof. I have been so affiliated at all times referred to in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. I verify that I believe the allegations contained therein to be true to my own knowledge, except as to matters stated to be upon information and belief, and as to those matters I believe them to be true. The grounds for my belief are based upon my personal knowledge gained during the course of my professional duties and my review of and familiarity with correspondence and other relevant documents, including the exhibits to the foregoing Verified Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 7th day of June, 2022 in Oslo, Norway.

Alan Curran
Solicitor Advocate
(England & Wales)
SRA No.: 315005